STATE of Wisconsin, Plaintiff-Respondent,

v.

Dyllon A. MADDIX, Defendant-Appellant.

Court of Appeals

*No. 2012AP1632–CR. Submitted on briefs January 23, 2013.
—Decided April 25, 2013.*

2013 WI App 64

(Also reported in 831 N.W.2d 778.)

179

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Chandra N. Harvey* and *Steven D. Phillips*, assistant state public defenders of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Sarah L. Burgundy*, assistant attorney general.

Before Higginbotham, Blanchard and Kloppenburg, JJ.

¶ 1. KLOPPENBURG, J. Dyllon A. Maddix appeals a judgment of conviction for manufacturing tet-

rahydrocannabinols (THC) in violation of Wis. Stat. § 961.41(1)(h)1. (2011–12),[1] arguing that the circuit court erred in denying his motion to suppress evidence that police officers obtained during a warrantless search of his apartment. The issue on appeal is whether the community caretaker exception to the warrant requirement of the Fourth Amendment applies to that search. We conclude that the officers were not engaged in a bona fide community caretaker function because there was no objectively reasonable basis for the officers to believe that a member of the public was in need of assistance or that the officers' or others' safety was at risk at the time of the search. We further conclude that, even assuming a bona fide community caretaker function, the public need and interest here did not outweigh the privacy intrusion. Thus, the warrantless search violated Maddix's Fourth Amendment right against unreasonable searches and, accordingly, we reverse and remand with directions.

## BACKGROUND

¶ 2. The following facts are undisputed. At approximately 1:55 a.m., City of Wausau Police Officers Eric Lemirand and Jacob Albee responded to a call reporting a domestic disturbance in the upper unit of a two-flat house in Wausau. Having been advised that the door providing access to the upstairs unit was located at the back of the house, the officers proceeded to the back of the house upon their arrival. While walking around the house, Albee heard "a female yelling in the upper portion of the building." A downstairs neighbor told the police that the sounds were coming from the upstairs unit and indicated which door led to the upstairs unit.

---

[1] All references to the Wisconsin Statutes are to the 2011–12 version unless otherwise noted.

¶ 3. Officer Lemirand knocked on the back door of the house, but there was no response. The officers heard "some female screams as if somebody had been in trouble." Believing somebody might be in danger, the officers radioed a supervisor for permission to forcibly enter, but were unable to speak with the supervisor. The officers heard "some screams again coming from upstairs so [they] forced entry based on the safety of the person screaming."

¶ 4. The officers forced open the locked back door of the house and climbed a set of stairs. Officer Albee knocked on the second-floor interior door, which Maddix opened. The door opened directly into an apartment. Maddix began to back away from the officers but Albee grabbed Maddix's arm and informed Maddix that he needed to "stay right there." Upon entry to the apartment, the officers noted the presence of an adult female, but no one else was immediately apparent. The officers separated Maddix and the female for separate interviews, conducted in different areas of the apartment.

¶ 5. Officer Albee interviewed Maddix near the entry door, in the hallway of the apartment.[2] Maddix stated that the female was his girlfriend, and that the two of them were the only persons in the residence when the officers arrived. Maddix told Albee that he and his girlfriend had been arguing because she thought he "was cheating on her." Albee "checked" the bedroom next to where he was speaking with Maddix and did not see another person in the room.

¶ 6. Meanwhile, Officer Lemirand interviewed the female in the bathroom of the apartment. She

[2] A hand-drawn map depicting the layout of the apartment (Exhibit 1 at the suppression motion hearing) is appended to this opinion.

stated that she and Maddix had been having an argument. Lemirand asked if she had been screaming and she said yes. Lemirand asked why and she said "because she was scared but she didn't know what she was scared of." Lemirand's conversation with the female lasted about fifteen to twenty minutes.

¶ 7. The officers then conferred for no more than ten minutes. According to Lemirand, the female's "explanation of the screaming did not make sense." Lemirand was concerned that another victim or aggressor was present in the apartment. Lemirand testified that he and Albee performed a "protective sweep" of the residence to "make sure that there [were] no other people in the apartment, nobody that could either launch an attack against [the officers] or another possible victim in the apartment." Lemirand "checked the living area and the kitchen . . . by sight [and] the bathroom and the bedroom that [he] was speaking to the female in."[3] Albee "checked" the other bedroom. This "sweep" took approximately ten minutes to perform. There is no evidence in the record that the officers requested or obtained consent for this search, and we will assume for our analysis that they did not.

¶ 8. About two to five minutes after the "sweep," Lemirand asked Albee if Albee had "checked the door on the other side of the hall from the bedroom for people." Albee stated that he had not. The officers realized that "at the end of the hallway that was not lit, there was another [closed] door back in the corner that [the police] had not checked." Lemirand testified that he

---

[3] During his testimony at the suppression hearing, Officer Lemirand characterized an area near the bathroom as a bedroom. The parties characterize this area as a storage space. On the appended diagram of the apartment, this storage space is the unmarked area located across from the bathroom.

"didn't know if either another person or [a] victim could be in that room" and opened the door. The room was dark, but Lemirand noticed a light on inside the room's closet. Lemirand "didn't know why there would be . . . a lit closet in a dark room" causing him to wonder if "potentially there was somebody in there." Lemirand asked Maddix if he could check to see if anyone was in the closet, and Maddix consented. In the closet, the officers discovered six marijuana plants under a flourescent light.

¶ 9. In the course of the subsequent criminal proceedings, Maddix moved to suppress the evidence obtained pursuant to the officers' warrantless entry to the apartment and allegedly unlawful search of rooms in the apartment. At the motion hearing, the circuit court ruled that the officers' warrantless entry into Maddix's apartment (by forcing entry in the back door of the house) was justified by the community caretaker exception, given the screams reported to and heard by the officers. Maddix does not challenge this ruling on appeal. The circuit court further ruled that the search of the rooms of the apartment was justifiable as a "protective sweep" and requested further briefing on the legality of the search of the overlooked bedroom.

¶ 10. During its oral ruling after briefing, the circuit court determined that the search of the over-looked bedroom in which the marijuana plants were found was justifiable under the community caretaker function. The circuit court found that both officers "sincerely believed" that a third person was involved and "had they not searched and had they left at that point and it turned out that someone had been injured or hurt or killed in that room, that would have been a dereliction of their duty." Maddix pleaded guilty pursu-

ant to a plea agreement, and the circuit court entered a judgment of conviction. Maddix now appeals.

## DISCUSSION

¶ 11. On appeal, Maddix argues that the officers' warrantless search of the overlooked bedroom in which the marijuana plants were discovered violated his right against unreasonable searches under the Fourth Amendment of the United States Constitution and Article I, Section 11 of the Wisconsin Constitution. Maddix asserts that the community caretaker exception, including protective sweeps pursuant to that exception, did not justify the search of rooms within the apartment generally or the search of the overlooked bedroom.

██

¶ 12. When reviewing the denial of a motion to suppress evidence, we uphold the circuit court's findings of fact unless clearly erroneous. *State v. Pinkard*, 2010 WI 81, ¶ 12, 327 Wis. 2d 346, 785 N.W.2d 592. However, the application of constitutional principles to the facts is a question of law that we review de novo. *Id.* Accordingly, "we independently review whether an officer's community caretaker function satisfies the requirements of the Fourth Amendment and Article I, Section 11 of the federal and state Constitutions." *State v. Kramer*, 2009 WI 14, ¶ 16, 315 Wis. 2d 414, 759 N.W.2d 598.

### A. Community Caretaker Exception to a Warrantless Search

██

¶ 13. The " 'Fourth Amendment to the United States Constitution and Article I, Section 11 of the

187

Wisconsin Constitution prohibit unreasonable searches and seizures.' " *State v. Horngren*, 2000 WI App 177, ¶ 8, 238 Wis. 2d 347, 617 N.W.2d 508 (quoted source omitted).[4] Warrantless searches are considered " 'per se unreasonable' " under the Fourth Amendment, subject to " 'a few well-delineated exceptions.' " *Pinkard*, 327 Wis. 2d 346, ¶ 13 (quoted source omitted). The State has the burden of establishing that a warrantless entry into a home occurred pursuant to a recognized exception to the warrant requirement. *State v. Leutenegger*, 2004 WI App 127, ¶ 12, 275 Wis. 2d 512, 685 N.W.2d 536. One such exception involves an officer functioning as a "community caretaker." *Pinkard*, 327 Wis. 2d 346, ¶ 14.

██

¶ 14. When acting as a community caretaker, an officer may conduct a search or seizure without probable cause or reasonable suspicion, as long as the search or seizure satisfies the reasonableness requirement of the Fourth Amendment. *State v. Kelsey C.R.*, 2001 WI 54, ¶ 34, 243 Wis. 2d 422, 626 N.W.2d 777. The United States Supreme Court first described the community caretaker function as follows:

> Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

*Cady v. Dombrowski*, 413 U.S. 433, 441 (1973).

---

[4] We interpret the provisions of the Fourth Amendment and Article I, Section 11 as equivalent when analyzing the community caretaker exception. *See Kramer*, 315 Wis. 2d 414, ¶ 18.

¶ 15. The Wisconsin Supreme Court has since noted that *Cady* does not limit the community caretaker function to incidents involving vehicle accidents. *Pinkard*, 327 Wis. 2d 346, ¶ 20. However, the warrantless entry of a residence is more suspect and subject to stricter scrutiny than entry and search of a motor vehicle. *State v. Ultsch*, 2011 WI App 17, ¶ 18, 331 Wis. 2d 242, 793 N.W.2d 505 (WI App 2010). Thus, the Wisconsin Supreme Court reads *Cady* as providing a community caretaker exception to warrantless home entries, provided "the community caretaker function was reasonably exercised under the totality of the circumstances of the incident under review." *Pinkard*, 327 Wis. 2d 346, ¶ 20. When officers enter a residence pursuant to the community caretaker exception, they may also undertake a protective sweep when they reasonably believe, under the totality of the circumstances, that such a search is necessary to assure the safety of officers and others. *Horngren*, 238 Wis. 2d 347, ¶ 20.

¶ 16. Wisconsin courts use a three-part test to determine whether an officer's conduct properly falls within the scope of the community caretaker exception. *Pinkard*, 327 Wis. 2d 346, ¶ 29. The court must assess:

> (1) whether a search or seizure within the meaning of the Fourth Amendment has occurred; (2) if so, whether the police were exercising a bona fide community caretaker function; and (3) if so, whether the public interest outweighs the intrusion upon the privacy of the individual such that the community caretaker function was reasonably exercised within the context of a home.

*Id.* We examine and apply each of these factors in turn, although the parties do not dispute the first factor.

189

## B. Application of the Community Caretaker Three-Part Test

¶ 17. We first explain how we will characterize the challenged search activity. At the circuit court level and on appeal, Maddix challenges the search of the rooms in the apartment and the search of the overlooked bedroom as two, separate, unlawful searches. However, in his argument, he appears to characterize them as one search that was unjustified due to the lapse of time between the officers' entry into the apartment unit and the officers' decision to perform a "sweep" without any exigent circumstances being present. The circuit court, concerned with the lapse of time between the "checking" of all of the rooms in the apartment save one and the search of the overlooked bedroom, characterized the officers' conduct as comprising two separate searches, and ruled separately upon the legality of each search.

¶ 18. As a matter of law, we view the overlooked bedroom search as a continuation of the apartment search. While two to five minutes passed between the "checking" of all but one of the rooms in the apartment and of the overlooked bedroom, the same reason prompted both stages of the "sweep" of the apartment as a whole – the female's failure to explain the reason for screams that she reported having made. No additional motivation for searching the overlooked bedroom surfaced during the two- to five-minute pause in the search; it is uncontested that the overlooked bedroom would have been included in the apartment search had it not been overlooked. The short lapse in the search is no different than the lapse that would result from an officer pausing to take a phone call or to communicate with witnesses, suspects, or other officers. Therefore,

190

we characterize the officers' conduct as one search and apply the three-part test to that search.

## 1. Existence of Search

¶ 19. The parties do not dispute that the officers conducted a warrantless search within the meaning of the Fourth Amendment. Therefore, the first element of the community caretaker exception's three-part test is met and we continue to the second step of the test.

## 2. Bona Fide Community Caretaker Function

██

¶ 20. As stated above, the second requirement is that police be engaged in a bona fide community caretaker function. This requires us to determine whether there is "an 'objectively reasonable basis' to believe [that] there is 'a member of the public who is in need of assistance.' " *Ultsch*, 331 Wis. 2d 242, ¶ 15 (quoting *Kramer*, 315 Wis. 2d 414, ¶¶ 30, 32). For a protective sweep, we must determine whether the officers reasonably believed that the search was necessary to assure the officers' or others' safety. *See Horngren*, 238 Wis. 2d 347, ¶¶ 20–21. To make those determinations, we examine the totality of the circumstances at the time of the officers' conduct. *State v. Gracia*, 2013 WI 15, ¶ 17, 345 Wis. 2d 488, 826 N.W.2d 87. A review of Wisconsin case law addressing the community caretaker function demonstrates that in this case, the officers did not have an objectively reasonable basis to believe that a member of the public was in need of assistance or that the officers' or others' safety was at risk at the time of the search.

¶ 21. In *Pinkard*, police received an anonymous tip that: the caller had just left a residence; inside that

residence two people "appeared to be sleeping"; cocaine, money, and a digital scale were located next to them; and the rear door to the residence was standing open. 327 Wis. 2d 346, ¶ 2. Upon arrival at the house, the officers stood outside the main door, which stood three-quarters open, knocked on the open door, and announced their presence. *Id.*, ¶ 3. After waiting thirty- to forty-five seconds and receiving no response, the officers entered to " 'check the welfare of the occupants.' " *Id.*, ¶ 4. While characterizing the circumstances as a "close case," the supreme court reasoned that the officers had an objectively reasonable basis for deciding that entry into the residence was necessary to ensure the health and safety of the occupants. *Id.*, ¶¶ 33, 35. The *Pinkard* court noted that with the door open and the occupants unresponsive, the occupants could have been victims of a crime or suffering from overdoses. *Id.*, ¶ 37. Therefore, the supreme court held that the officers reasonably exercised a bona fide community caretaker function when they entered the residence. *Id.*, ¶ 40. A scenario with at least some similar elements, and the same result, may be found in *State v. Ferguson*, 2001 WI App 102, ¶¶ 4–5, 14–15, 244 Wis. 2d 17, 629 N.W.2d 788 (officers reasonably searched a bedroom and bedroom closet after observing an extremely intoxicated person vomiting at an underage drinking party, being informed that people were in the bedroom, and being unable to get anyone to come out of the bedroom or respond to knocking and yelling).

¶ 22. In *Ultsch*, we distinguished facts involving a car crash from those in *Pinkard*, because the officers had fewer reasons to be concerned that a member of the public was in need of assistance. *Ultsch*, 331 Wis. 2d 242, ¶ 17. In *Ultsch*, police officers investigated a traffic accident in which a driver collided with a brick

wall and fled the scene in the vehicle. *Id.*, ¶ 2. The officers found the damaged car at the end of a long driveway. *Id.* While police were at the end of the driveway, another car came down the driveway, and its driver indicated to police that the driver of the damaged vehicle was his girlfriend and she was in the house, " 'possibly in bed or asleep.' " *Id.*, ¶ 3. After the boyfriend left, the officers went to the house, knocked on the door, announced their presence, and received no response. *Id.*, ¶ 4. An officer turned the doorknob and discovered it was unlocked. *Id.* The officer entered the house, made his way to the bedroom, found Ultsch asleep, and ultimately arrested her for operating while intoxicated. *Id.*, ¶ 4–5. The *Ultsch* court concluded that the officers lacked an objectively reasonable basis to believe Ultsch was in need of assistance based on the following facts: the damage to the car, though significant, was limited to the vehicle's left front fender; no person, including Ultsch's boyfriend, gave officers information that indicated Ultsch was injured or in need of assistance; and the officers did not notice any blood in the snow when traveling up the long driveway to the house nor was there any visible blood or other indication of injury on the vehicle. *Id.*, ¶¶ 19–21.

¶ 23. The Wisconsin Supreme Court again examined whether officers exercised a bona fide community caretaker function in *Gracia*, 345 Wis. 2d 488, ¶¶ 17–22. In *Gracia*, police officers received a report of a traffic signal down and, upon arriving at the scene, discovered a mangled license plate lying next to the damaged traffic signal. *Id.*, ¶ 6. After an investigation, officers went to Gracia's residence. *Id.*, ¶ 7 and n.7. The vehicle in the driveway matched the registration's description and its condition demonstrated that it had "clearly been in an accident." *Id.*, ¶ 7. No one answered

the door, but as the officers were about to leave, Gracia's brother arrived. The brother informed them that he and Gracia resided in the home, and that Gracia should be inside. *Id.*, ¶ 8. The officers asked to enter the house, explaining that they were worried about Gracia's potential injuries. *Id.* After Gracia's brother went in the house for several minutes, he came out and told the officers that they could come inside, brought them to Gracia's bedroom door, and told them Gracia was locked inside. *Id.* Gracia yelled "go away" from inside his room in both Spanish and English. *Id.* Gracia's brother voluntarily, without a request from police, used his shoulder to force open the locked door. *Id.* Once the door opened, the officers made contact with Gracia, observed indicators of intoxication, and eventually arrested him for operating while intoxicated. *Id.*

¶ 24. The *Gracia* court determined that the officers exercised a bona fide community caretaker function, concluding that the officers had an objectively reasonable basis to believe Gracia needed assistance and was hurt. *Id.*, ¶¶ 21–22. First, the court cited the significant damage to Gracia's vehicle and the fact that a traffic signal was "completely knocked down." *Id.*, ¶ 21. Second, noting that "the subjective intent of the officers is relevant," the court relied on the officers' stated concerns for Gracia's well-being. *Id.* Finally, the court noted that Gracia's brother's apparent concern about Gracia's safety and unrequested decision to force open the bedroom door supported an objectively reasonable basis to believe that Gracia was hurt and needed assistance. *Id.*, ¶ 22.

¶ 25. Comparing the facts in *Pinkard* and *Gracia*, where the supreme court held that the officers had an objectively reasonable basis to believe someone may be in need of assistance, and even those in *Ultsch*, where

194

the officers' conduct fell outside the scope of the community caretaker function, to the facts in this case establishes the clear absence of an objectively reasonable basis to search Maddix's apartment.

¶ 26. Here, the officers went to Maddix's apartment due to a call reporting a domestic disturbance and heard screams upon their arrival. Upon entering the apartment, the officers encountered Maddix and the female, who appeared to be the only people in the apartment. After interviewing Maddix and the female separately, the officers were "not satisfied" with the female's explanation as to why she screamed – "she was scared but she didn't know what she was scared of" – and believed that another person who "either was causing the screaming earlier or perhaps was a victim" was in the apartment. Thus, the primary basis for conducting the search of the rooms in the apartment, after conducting the initial interviews, was the female's failure to identify the source of the fear that caused her to scream.

¶ 27. Unlike in *Pinkard*, *Ultsch*, and *Gracia*, where the officers had evidence pointing concretely to the possibility that a member of the public was in need of assistance (a damaged vehicle or drug use coupled with an open doorway), here no evidence directly corroborated the officers' theory that another person was present in the apartment, who was either a crime victim or a perpetrator. Nor, unlike in *Pinkard* and *Gracia*, where another person indicated concern for the well-being of one or more persons (an anonymous tip and a brother's direction), was there any corroboration that someone was in need of assistance here. Rather, to the contrary, Maddix told Officer Albee during the individual interview that he and the female were the

195

only ones in the apartment. Maddix explained that the two were in an argument because the female suspected that Maddix was "cheating on her." Similarly, during her individual interview, the female told Officer Lemirand that the two were having an argument. The female also told the officer that she was the source of the screams. While it was certainly a physical possibility that one or more persons were in the apartment, there were no objectively reasonable grounds to suspect that the disturbance involved persons other than Maddix and his girlfriend, who each independently told the officers that they had been arguing about their own relationship.

¶ 28. Moreover, based on the testimony, the officers were present in the apartment for twenty-five to thirty minutes prior to initiating the search of the rooms in the apartment. During that time, the record lacks any evidence supporting the theory that anyone else was present, such as noises, nervous behavior by Maddix or the female, or statements by either of them that implied the presence of another person. We need not speculate on what additional evidence might have been enough, because here there was virtually no such evidence. Applying an objective standard, we conclude that the female's failure to offer an explanation for her fear, together with all other evidence that the record reflects that the officers knew, did not provide " 'an objectively reasonable basis' " for the officers to believe " 'a member of the public [was] in need of assistance' " or that the officers' or others' safety was at risk. *Ultsch*, 331 Wis. 2d 242, ¶ 15 (quoted source omitted); *see Horngren*, 238 Wis. 2d 347, ¶¶ 20–21.

¶ 29. The facts demonstrate that the officers responded to an apparent domestic disturbance involving only Maddix and the female. Based on the circumstances with which they were presented, the officers, in

lawfully entering the apartment and separately interviewing the two persons who appeared to be the only persons in the apartment, properly exercised their community caretaker function and achieved the purpose for which they were dispatched. Both persons gave the same basic account and the female acknowledged screaming. The female's failure to explain why she was afraid did not provide a basis to objectively conclude, based on the totality of the facts known to the officers at the time, that anyone else was in the apartment so as to require the officers to engage in their community caretaker function.

¶ 30. We recognize that the circuit court found the officers credible in their belief that a third person, either a victim or an aggressor, might be in the apartment. We further recognize that an officer's subjective intent may be relevant. *See Gracia*, 345 Wis. 2d 488, ¶ 21 (noting that subjective intent of an officer was relevant when the officer expressed his concern for Gracia's well-being). However, police subjective intent does not alone dictate the result, and in any case an officer must have an *objectively reasonable* basis to conclude that there is a need to render assistance. *See id.*, ¶ 19. Here, even acknowledging the officers' subjective beliefs, we conclude that the officers did not have an objectively reasonable basis to believe a third person was in the apartment whose discovery might be necessary for safety purposes. It is not enough that the officers subjectively thought that perhaps someone else was in the apartment; what matters is whether they possessed any facts that would lead to a reasonable conclusion that someone else was present to justify a search to render assistance or protection. We conclude that no such facts were present here.

197

### 3. Balancing Test

¶ 31. Even if we determined that the officers' search constituted an exercise of a bona fide community caretaker function, the search would still fall outside the community caretaker exception under the third step. The final inquiry calls for a determination whether the officers' conduct was reasonable and to "balance the public interest or need that is furthered by the officers' conduct against the degree and nature of the intrusion on the citizen's constitutional interest." *Pinkard*, 327 Wis. 2d 346, ¶ 41. In balancing these interests, we consider four factors:

> (1) the degree of the public interest and the exigency of the situation; (2) the attendant circumstances surrounding the [search], including time, location, the degree of overt authority and force displayed; (3) whether an automobile is involved; and (4) the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished.

*Id.*, ¶ 42 (quoting *Kramer*, 315 Wis. 2d 414, ¶ 41) (footnote omitted). Under this broad analysis, a number of the same facts that lead to our conclusion regarding the second factor contribute to our conclusion regarding the third factor, and we will attempt to avoid unnecessary repetition in addressing the third factor.

¶ 32. First, examining the extent of the public's interest and the exigency of the situation, this case is distinguishable from *Pinkard* and *Gracia*. While the officers here were responding to an apparent domestic disturbance and heard screaming, upon their arrival the parties admitted to being in an argument and the female acknowledged that she had screamed. Maddix

198

and the female cooperated with the officers, at least insofar as they submitted to interviews.

¶ 33. And, while we must be careful not to substitute our hindsight judgment for the difficult, on-the-scene choices faced by police, the objective fact that the officers waited twenty-five to thirty minutes before performing the search in itself suggests that the circumstances did not call out for an immediate search. Unlike in *Gracia*, where the officers observed significant damage to a vehicle, and in *Pinkard*, where the door was open and the occupants were apparently vulnerable, the facts in this case do not point to the likelihood of hidden injury or danger.

¶ 34. Turning to the second factor, we consider this a factor that does not weigh strongly in either direction. The officers did not control the time or location, because they were responding to a call reporting a domestic disturbance. *See, e.g., Horngren*, 238 Wis. 2d 347, ¶ 15; *Pinkard*, 327 Wis. 2d 346, ¶ 49 (both noting that time and location do not favor a conclusion that a search was an unreasonable exercise of the community caretaker function when officers responded to calls for assistance). Also, there is no evidence in the record that the officers displayed their weapons or threatened anyone involved. It is true that the officers entered the building and the apartment unit without consent or a warrant, and that Officer Albee grabbed Maddix's arm and told him to "stay right there" when the officers first arrived. However, that is not the conduct that is claimed to have violated the Fourth Amendment; Maddix concedes that it was justified by circumstances that included the screams. Nevertheless, the officers conducted a continuing search of the entire apartment without requesting consent to do so (until the final search of the closet), an act displaying overt

authority over the occupants. We conclude that the attendant circumstances surrounding the search are a neutral factor in the balancing test in this case.

¶ 35. The third factor asks whether an automobile is involved. This case concerns a search of a residence, not a motor vehicle, and thus "[t]his is not a relevant factor here except to recognize that one has a heightened privacy interest in preventing intrusions into one's home." *Pinkard*, 327 Wis. 2d 346, ¶ 56; *cf., Gracia*, 345 Wis. 2d 488, ¶ 27 ("The third factor is irrelevant because the search was not of an automobile, so we look next at the fourth factor"); *but see Payton v. New York*, 445 U.S. 573, 586 (1980) ("searches and seizures inside a home without a warrant are presumptively unreasonable").

¶ 36. Under the fourth and final factor of the balancing test, we examine the possible alternatives, including their effectiveness, to the actual police intrusion that occurred. The officers could have asked both Maddix and the female whether anyone else was present in the apartment (Maddix told the officers upon their arrival that only he and his girlfriend were present in the apartment). Of course, the officers would not have been required to accept at face value any statement made by either person, particularly since the officers had reason to believe that both were at best telling only part of the truth about what had occurred that night. However, the officers could have attempted to probe each on the topic. It is relevant to the overall question of reasonableness that the officers looked for people in every room of the apartment, without consent, apparently without first asking one person present whether anyone else might be there and after Maddix already stated that only he and his girlfriend were present. Thus, even had we concluded that the officers engaged in a bona fide community caretaker

function, this factor favors concluding that the officers unreasonably exercised that function.

¶ 37. We are mindful of the Wisconsin Supreme Court's caution against "taking a too-narrow view" when determining whether the community caretaker function is present:

> An officer "less willing" to discharge community care-taking functions implicates seriously undesirable consequences for society at large: In that event, we might reasonably anticipate "the assistance role of law enforcement . . . in this society will go downhill . . . . The police cannot obtain a warrant for . . . entry. [W]ithout a warrant, the police are powerless. In the future police will tell such concerned citizens, 'Sorry. We can't help you. We need a warrant and can't get one.' "

*Horngren*, 238 Wis. 2d 347, ¶ 18 (quoting *People v. Ray*, 981 P.2d 928, 939 (Cal. 1999) (internal citations omitted)). However, we are satisfied that our conclusion in this case that the officers did not exercise a bona fide community caretaker function is not a narrow reading of that exception. Under the facts of this case, after the officers validly exercised the community caretaker function by entering the apartment, addressing the apparent domestic situation, and making a reasonable assessment of the need for any further assistance or protection, there was simply no objectively reasonable basis to conclude that searching the apartment was justified under the community caretaker function. To conclude otherwise, in our view, could allow this exception to justify virtually any residential "sweep" as part of a police response to an alleged domestic disturbance.

## CONCLUSION

¶ 38. We conclude that the officers' search in this case did not fall within the community caretaker excep-

tion to a warrantless search and therefore we reverse the circuit court's judgment of conviction and order denying the motion to suppress, and remand for the circuit court to suppress evidence resulting from the warrantless search.

*By the Court.*—Judgment reversed and cause remanded with directions.

A. Albee & Defendant meet to talk (15-20 min).

B. Leonard & female meet to talk (15-20 min).

C. Officers talk (10 minutes). Items seen in kitchen.

* A, B, C not to scale.