**COURT OF APPEALS
DECISION
DATED AND FILED**

**December 21, 2021**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2020AP1715-CR**

**STATE OF WISCONSIN**

Cir. Ct. No.  2019CF962

**IN COURT OF APPEALS
DISTRICT III**

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

RANDY J. PROMER,

   DEFENDANT-APPELLANT.

        APPEAL from a judgment of the circuit court for Eau Claire County:  SARAH MAE HARLESS, Judge.  *Affirmed*.

        Before Stark, P.J., Hruz and Gill, JJ.

        ¶1      STARK, P.J.   Randy Promer appeals a judgment convicting him of one count of operating a motor vehicle with a detectable amount of a restricted controlled substance in his blood, as a seventh offense, and one count of possession of methamphetamine.  Promer argues the circuit court erred by denying

his motion to suppress evidence. He contends that law enforcement lacked reasonable suspicion to stop his vehicle, and that the community caretaker doctrine did not justify the stop.

¶2 We conclude the stop of Promer's vehicle was permissible under the community caretaker doctrine. In so doing, we reject Promer's argument that the United States Supreme Court's decision in *Caniglia v. Strom*, 141 S. Ct. 1596 (2021), "eliminat[ed] the community caretaker doctrine as a standalone exception to the Fourth Amendment warrant requirement." Instead, we conclude *Caniglia* merely held that the community caretaker doctrine cannot be used to justify a warrantless intrusion into a home. As this case involves the stop of an automobile, *Caniglia* is inapplicable. Accordingly, the circuit court properly denied Promer's suppression motion, and we therefore affirm his judgment of conviction.

## BACKGROUND

¶3 The following facts were adduced during the hearing on Promer's suppression motion and are not disputed for purposes of this appeal. On July 1, 2019, at around 9:30 p.m., a bartender at a sports bar reported to law enforcement that a man was passed out or sleeping in a car in the bar's parking lot. Eau Claire County Sheriff's Deputies Riley Schulner and Kyle Jacobson responded to the call. Dispatch informed the deputies that the car was a blue Volkswagen Jetta that was registered to Promer; that Promer was on probation and had six prior convictions for operating a motor vehicle while intoxicated (OWI); that he had an outstanding warrant from Florida; and that he was subject to a blood alcohol concentration (BAC) limit of 0.02.

¶4 When Schulner arrived at the bar about ten minutes later, he saw Promer's vehicle traveling northbound on the road on which the bar was located.

2

As Schulner turned into the bar's parking lot, the vehicle slowed down and turned into the lot behind him. Schulner continued into the parking lot and circled around to get behind Promer's vehicle. He observed that the vehicle was "traveling kind of at a slower speed through the middle of the parking lot." Schulner testified that seeing the vehicle driving back into the parking lot where the driver had reportedly been passed out was "kind of concerning."

¶5      Schulner then activated his squad car's emergency lights. He testified that he did so "to make contact with the driver and essentially check [his] welfare after getting the report of him passed out … behind the wheel." After Schulner activated his emergency lights, Promer's vehicle continued for a short distance and then pulled into a parking spot where it drove onto the curb before backing down again.

¶6      Jacobson arrived on the scene shortly after Schulner and observed Promer's vehicle traveling slowly with Schulner's vehicle behind it. Jacobson saw Promer's vehicle pull into a parking spot and strike the curb. Jacobson then parked his squad car next to Schulner's and activated its emergency lights.

¶7      The deputies approached the driver's side door of Promer's vehicle and made contact with the driver, whom Schulner recognized as Promer from prior law enforcement contacts. The deputies observed that Promer was slumped over in his seat with his head dropping forward, and that he appeared to be unable to keep his head up or his eyes open. When Jacobson asked Promer if he was okay, Promer sat up and loudly said "yeah." The deputies observed that Promer's speech was slurred, and his pupils were dilated. Promer told the deputies that he was tired and had not slept for several days. He also stated that he believed his

blood sugar level was "off" or "high," that he took the medication Metformin for diabetes, and that he had not checked his blood sugar in two weeks.

¶8      Promer told the deputies that he was going home from a friend's house in Altoona. Jacobson testified, however, that based on where Promer lived, his story "didn't make sense." Promer also stated that he was resting his eyes, and that he had pulled back into the parking lot to rest for a few minutes. He denied drinking or using drugs. The deputies asked Promer if he wanted to be checked out by emergency medical services, but he declined.

¶9      Jacobson, who is a trained drug recognition expert, did not believe that Promer's condition was the result of him being tired or his blood sugar being high. Instead, Jacobson believed that Promer's condition was consistent with "com[ing] down" after using a stimulant drug. Jacobson therefore asked Promer to get out of his vehicle to perform field sobriety tests. After Jacobson asked Promer to exit the vehicle three or four times, Promer finally got out but could not stand still. Promer was not cooperative during the field sobriety tests and began to walk away from the deputies.

¶10     The deputies then placed Promer under arrest. A search incident to arrest revealed a scale between Promer's t-shirt and sweatshirt, which had a white substance on it that was consistent with illegal drugs. During a subsequent search of Promer's vehicle, the deputies discovered a vape cartridge container labeled "THC" and a pipe consistent with the type commonly used to smoke methamphetamine.

¶11     The State ultimately charged Promer with five offenses: (1) OWI, as a seventh offense; (2) possession of methamphetamine, as a repeater; (3) possession of tetrahydrocannabinols (THC), as a repeater; (4) possession of

4

drug paraphernalia, as a repeater; and (5) operating a motor vehicle with a detectable amount of a restricted controlled substance in the blood, as a seventh offense. Promer moved to suppress evidence, arguing that the deputies lacked reasonable suspicion to stop his vehicle, and that the stop was not justified under the community caretaker doctrine.

¶12 Following an evidentiary hearing, the circuit court denied Promer's suppression motion, concluding that the community caretaker doctrine justified the deputies' stop of Promer's vehicle. The court noted that shortly after a bartender reported that a person was passed out in a car in the bar's parking lot, Schulner saw the same car driving back into the parking lot at a slow rate of speed. The court reasoned that "[t]he description of a person passed out coupled with the somewhat unusual behavior of, after being described as passed out, getting onto the road and then coming right back into the parking lot" was "unusual enough to suggest that the police should be able to check out and make sure that this person is okay."

¶13 The circuit court further stated that after making the decision to stop Promer's vehicle, the deputies saw the vehicle bump into a curb, and they later observed that Promer was slumped over, he could not keep his eyes open, his pupils were dilated, and his speech was slurred. The court concluded that in light of Jacobson's training and experience, those observations indicated that Promer was under the influence of a drug, which provided a basis "to further investigate and request field sobriety tests."

¶14 Promer subsequently pled no contest to operating a motor vehicle with a detectable amount of a restricted controlled substance in his blood, as a seventh offense, and to possession of methamphetamine, without the repeater

5

enhancer. The remaining charges were dismissed and read in at sentencing. The circuit court followed the parties' joint sentence recommendation and imposed concurrent sentences totaling three years' initial confinement and three years' extended supervision. Promer now appeals, arguing that the court erred by denying his suppression motion. *See* WIS. STAT. § 971.31(10) (2019-20) (permitting appellate review of an order denying a motion to suppress evidence, notwithstanding the defendant's guilty or no-contest plea).

## DISCUSSION

¶15 When reviewing the denial of a motion to suppress evidence, we uphold the circuit court's findings of fact unless they are clearly erroneous. *State v. Maddix*, 2013 WI App 64, ¶12, 348 Wis. 2d 179, 831 N.W.2d 778. However, the application of constitutional principles to the facts is a question of law that we review independently. *Id.*

¶16 Both the Fourth Amendment to the United States Constitution and article I, section 11 of the Wisconsin Constitution protect against unreasonable searches and seizures. U.S. CONST. amend. IV; WIS. CONST. art. I, § 11. A traffic stop must be reasonable under the circumstances, and it is "widely accepted that traffic stops may be justified by either probable cause or reasonable suspicion." *State v. Houghton*, 2015 WI 79, ¶29, 364 Wis. 2d 234, 868 N.W.2d 143. In this case, the State does not argue that the initial stop of Promer's vehicle was based on either probable cause or reasonable suspicion. Instead, the State argues that the stop was justified under the community caretaker doctrine.

¶17 The community caretaker doctrine provides that "[w]hen acting as a community caretaker, an officer may conduct a search or seizure without probable cause or reasonable suspicion, as long as the search or seizure satisfies the

6

reasonableness requirement of the Fourth Amendment." *Maddix*, 348 Wis. 2d 179, ¶14. The doctrine has its origins in *Cady v. Dombrowski*, 413 U.S. 433 (1973), and was first applied by the Wisconsin Supreme Court in *Bies v. State*, 76 Wis. 2d 457, 251 N.W.2d 461 (1977). *State v. Kramer*, 2009 WI 14, ¶¶19-20, 315 Wis. 2d 414, 759 N.W.2d 598. Promer argues, however, that the United States Supreme Court's recent decision in *Caniglia* eliminated the community caretaker doctrine as a standalone justification for warrantless seizures effectuated without probable cause or reasonable suspicion.

¶18 Promer reads *Caniglia* too broadly. Caniglia's wife contacted law enforcement and reported that during an argument the previous evening, Caniglia had placed a handgun on the dining room table of their home and had asked her to shoot him. *Caniglia*, 141 S. Ct. at 1598. When law enforcement arrived at the home, they spoke with Caniglia on the porch, and he denied that he was suicidal. *Id.* Nonetheless, he agreed to go to the hospital for a psychiatric evaluation, but only after the officers promised not to confiscate his firearms. *Id.* After Caniglia left for the hospital, however, the officers entered the home and seized two handguns. *Id.*

¶19 Caniglia sued, asserting that the officers had violated the Fourth Amendment "when they entered his home and seized him and his firearms without a warrant." *Id.* Relying on *Cady*, the United States Court of Appeals for the First Circuit concluded that the "decision to remove [Caniglia] and his firearms from the premises fell within a 'community caretaking exception' to the warrant requirement." *Caniglia*, 141 S. Ct. at 1598.

¶20 The United States Supreme Court reversed. The Court noted that *Cady* involved the warrantless search of an impounded vehicle for an unsecured

7

firearm. *Caniglia*, 141 S. Ct. at 1598. The *Cady* Court determined that search did not violate the Fourth Amendment, reasoning that "police officers who patrol the 'public highways' are often called to discharge noncriminal 'community caretaking functions,' such as responding to disabled vehicles or investigating accidents." *Caniglia*, 141 S. Ct. at 1598 (quoting *Cady*, 413 U.S. at 441). The *Caniglia* Court explained: "The question today is whether *Cady*'s acknowledgment of these 'caretaking' duties creates a standalone doctrine that justifies warrantless searches and seizures *in the home*. It does not." *Caniglia*, 141 S. Ct. at 1598 (emphasis added).

¶21 In reaching that conclusion, the *Caniglia* Court emphasized that *Cady* involved the warrantless search of a vehicle, and that the *Cady* Court had drawn an "unmistakable distinction between vehicles and homes" when discussing law enforcement's community caretaking functions. *Caniglia*, 141 S. Ct. at 1599. The Court concluded: "What is reasonable for vehicles is different from what is reasonable for homes. *Cady* acknowledged as much, and this Court has repeatedly 'declined to expand the scope of ... exceptions to the warrant requirement to permit warrantless entry into the home.'" *Caniglia*, 141 S. Ct. at 1600 (quoting *Collins v. Virginia*, 584 U.S. ___, 138 S. Ct. 1663, 1672 (2018)).

¶22 As the foregoing excerpts make clear, contrary to Promer's assertion, *Caniglia* did not "eliminate" the community caretaker doctrine as a justification for warrantless seizures unsupported by probable cause or reasonable suspicion. Instead, *Caniglia* clarified that the community caretaker doctrine, as originally recognized in *Cady*, is limited to cases involving searches and seizures of automobiles and cannot be used to justify warrantless intrusions into a home. Here, the seizure occurred when law enforcement stopped Promer's vehicle.

Nothing in *Caniglia* prevents us from applying the community caretaker doctrine in that context.

¶23    We therefore consider whether the State has met its burden to establish that the seizure of Promer's vehicle was permissible under the community caretaker doctrine.  *See Kramer*, 315 Wis. 2d 414, ¶17 ("The State bears the burden of proving that the officer's conduct fell within the scope of a reasonable community caretaker function.").  To determine whether a seizure was justified under the community caretaker doctrine, we conduct a three-step analysis, considering: (1) whether a seizure within the meaning of the Fourth Amendment occurred; (2) if so, whether the police conduct was a bona fide community caretaker activity; and (3) if so, whether the public need and interest outweighed the intrusion upon the individual's privacy.  *Id.*, ¶21.  In this case, it is undisputed that a seizure occurred within the meaning of the Fourth Amendment when Schulner activated his squad car's emergency lights and stopped Promer's vehicle. We therefore turn to the second and third steps of the analysis.

*A. Bona fide community caretaker activity*

¶24    When determining whether law enforcement was engaged in a bona fide community caretaker activity, we consider whether there was an "objectively reasonable basis" for law enforcement to believe that there was "a member of the public who [was] in need of assistance."  *State v. Ultsch*, 2011 WI App 17, ¶15, 331 Wis. 2d 242, 793 N.W.2d 505 (2010) (quoting *Kramer*, 315 Wis. 2d 414, ¶¶30, 32).  In so doing, we consider "the totality of the circumstances as they existed at the time of the police conduct."  *Kramer*, 315 Wis. 2d 414, ¶30.

¶25    Here, we agree with the circuit court that when the deputies stopped Promer's vehicle, they had an objectively reasonable basis to believe, under the

totality of the circumstances, that a member of the public was in need of assistance. The deputies knew that a bartender had called law enforcement to report that a man was passed out or sleeping in a car parked in the bar's parking lot. When the deputies arrived at the bar about ten minutes later, they saw the same vehicle driving northbound on the road where the bar was located, and the vehicle then turned back into the bar's parking lot and drove through the lot at a slow speed. The circuit court correctly recognized that a person being passed out or sleeping in a vehicle in a parking lot, combined with the "somewhat unusual behavior of, after being described as passed out, getting onto the road and then coming right back into the parking lot" was "unusual enough to suggest that the police should be able to check out and make sure that this person is okay."

¶26     Promer concedes that if the deputies had found a person sleeping or passed out in a car when they arrived at the bar, it would have been reasonable for them "to believe the person may need assistance[,] and the community caretaker function arguably would be in play." However, because the deputies instead found the car in question "driving safely on the road and observed the car safely execute a turn into a parking lot," Promer asserts that the initial safety concern created by the bartender's report dissipated, and the deputies' performance of their community caretaker function therefore terminated.

¶27     Promer relies on *Ultsch* in support of his dissipation argument. In *Ultsch*, a vehicle hit and caused substantial damage to a building. *Ultsch*, 331 Wis. 2d 242, ¶2. Law enforcement later found the vehicle located outside of a private residence two to three miles away from the accident scene. *Id.* Officers observed that the damage to the vehicle was limited to its left front fender, the airbags had not deployed, the windshield was intact, there was no damage to the

passenger compartment or to the driver's side door, and there was no blood or other indication of injury. *Id.*, ¶19.

¶28 The officers encountered an individual who was leaving the residence and who identified himself as the owner of the home. *Id.*, ¶3. He told police that the driver of the damaged vehicle was his girlfriend and that she was inside the house "possibly in bed or asleep." *Id.* He did not tell the officers that the driver was injured or in need of assistance. *Id.*, ¶20. The officers proceeded to the house, where they knocked and announced their presence but received no answer. *Id.*, ¶4. They then opened the house's unlocked door, entered the house, and proceeded to a back bedroom, where they found Ultsch asleep in bed. *Id.* Ultsch was subsequently placed under arrest for OWI. *Id.*, ¶5.

¶29 On appeal, we concluded that the officers were not performing a bona fide community caretaker function when they entered the residence because there was no objectively reasonable basis for them to conclude that Ultsch was in need of assistance. *Id.*, ¶22. We noted that the damage to Ultsch's vehicle was not significant enough to give rise to a concern for her safety. *Id.*, ¶19. We also observed that no person had given the officers any information to indicate that Ultsch was in a vulnerable situation, nor did they observe anything to suggest that she was injured or in need of assistance. *Id.*, ¶¶20-21.

¶30 Thus, in *Ultsch*, although the officers' knowledge that a vehicle had hit and caused substantial damage to a building supported a belief that the vehicle's driver might be in need of assistance, the officers subsequently became aware of other facts that dispelled that belief. The same is not true here. The bartender's report that a person was sleeping or passed out in a vehicle in the bar's parking lot gave rise to an objectively reasonable belief that the person was

experiencing some type of medical difficulty or was too tired to drive safely. The deputies' observation of the same vehicle driving a short time later—and, specifically, driving back into the same parking lot—gave rise to an objectively reasonable concern that the driver was in need of assistance, and that his continued operation of the vehicle could put both the driver and the public at risk.

¶31 Promer next argues that after the deputies saw him awake and safely driving, "this case pivoted from a community caretaker action into a criminal investigation" because the deputies' conduct was no longer "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *See Cady*, 413 U.S. at 441. Promer emphasizes that the deputies: (1) knew him from prior law enforcement contacts; (2) knew that he was on probation; (3) knew that he had prior OWI convictions and was subject to a 0.02 BAC limit; and (4) knew that he was subject to a Florida warrant. Promer asserts that the deputies' knowledge of these facts "could not help but impact the focus of the investigation." He further asserts that Schulner "admitted" during his testimony that he intended to perform a traffic stop when he activated his squad car's emergency lights.

¶32 Promer's argument fails because although the *Cady* Court described community caretaking functions as being "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute," *see id.*, our supreme court has clarified that this language "does not mean that if the police officer has any subjective law enforcement concerns, he [or she] cannot be engaging in a valid community caretaker function," *see Kramer*, 315 Wis. 2d 414, ¶30. Instead, "in a community caretaker context, when under the totality of the circumstances an objectively reasonable basis for the community caretaker function is shown, that determination is not negated by the officer's

subjective law enforcement concerns." *Id.* Thus, while a court may consider an officer's subjective intent in evaluating whether the officer was acting as a bona fide community caretaker, "if the court concludes that the officer has articulated an objectively reasonable basis under the totality of the circumstances for the community caretaker function, [the officer] has met the standard of acting as a bona fide community caretaker, whose community caretaker function is totally divorced from law enforcement functions." *Id.*, ¶36.

¶33 As explained above, we have already concluded that the deputies in this case had an objectively reasonable basis to believe that Promer was in need of assistance. The deputies' awareness of other facts suggesting that Promer's operation of his vehicle might also constitute the commission of a crime did not negate their objectively reasonable concern for Promer's safety. Moreover, while Schulner acknowledged that he intended to perform a "traffic stop" when he stopped Promer's vehicle, he also testified that the reason for the stop was "to check the welfare of the operator based on the information we had been provided." Jacobson similarly testified that he made contact with Promer "[t]o check on his welfare to make sure that he's okay." This testimony supports a conclusion that the deputies were engaging in a bona fide community caretaker activity when they stopped Promer's vehicle.

¶34 Promer also contends that even if the stop of his vehicle was permissible under the community caretaker doctrine, "the community caretaker exception terminated once the deputies spoke with [him]." Promer asserts it became clear during that conversation that he did not require assistance, as he provided the deputies with a detailed explanation for his conduct. He argues that this explanation, coupled with the fact that the deputies had not observed any erratic driving, "eliminated the community caretaker justification."

¶35    Viewed objectively, nothing that Promer told the deputies dispelled a reasonable belief that he needed assistance.  Instead, Promer's conversation with the deputies, combined with their observations of him during the stop, made it apparent that he did need assistance because he was in no condition to drive.  As noted above, when the deputies made contact with Promer, he was slumped over in his seat with his head falling forward, and he appeared to be unable to keep his head up or his eyes open.  Promer's speech was slurred and his pupils were dilated.  Promer told the deputies that he was tired, that he had not slept for several days, that his blood sugar was "off" or "high," and that he had not checked his blood sugar in two weeks.  He said that he was resting his eyes, and that had he had pulled back into the parking lot to rest for a few minutes.  These additional facts confirmed that Promer was not fit to drive and did nothing to dispel the deputies' objectively reasonable belief that he was in need of assistance.

¶36    For all of the foregoing reasons, we conclude the State met its burden to establish that the deputies were engaged in a bona fide community caretaker activity when they stopped Promer's vehicle.  We therefore turn to the third step of the community caretaker analysis.

### B. *Public interest versus intrusion upon privacy*

¶37    In the third and final step of the community caretaker analysis, we consider whether the public need and interest outweighed the intrusion upon Promer's privacy.  *See Kramer*, 315 Wis. 2d 414, ¶21.  Stated differently, we must determine whether the deputies' "exercise of a bona fide community caretaker function was reasonable."  *See id.*, ¶40.  "The stronger the public need and the more minimal the intrusion upon an individual's liberty, the more likely the police conduct will be held to be reasonable."  *Id.*, ¶41.  In balancing these interests, we

consider the following four factors: (1) the degree of the public interest and the exigency of the situation; (2) the attendant circumstances surrounding the seizure, including time, location, and the degree of overt authority and force displayed; (3) whether an automobile was involved; and (4) the availability, feasibility, and effectiveness of alternatives to the type of intrusion actually accomplished. *Id.*

¶38  We conclude that all four of these factors support a determination that the public need and interest supporting the stop of Promer's vehicle outweighed the intrusion upon his privacy.  First, there was a strong public interest in the deputies checking on Promer's well-being in order to protect both Promer and the public.  As described above, the bartender's report and the deputies' observations of Promer's vehicle prior to the stop gave rise to an objectively reasonable concern that Promer was experiencing some kind of medical difficulty or was too tired to drive safely.  After the deputies stopped Promer's vehicle, his condition further demonstrated that he could not drive safely, as he was slumped over and could not keep his head up or his eyes open.  We agree with the State that even if Promer's condition "actually had been caused by blood sugar issues and tiredness, the deputies would have been justified in stopping his car to protect him and the public."  Obviously, Promer's condition was such that his driving presented a significant risk of harm to both Promer and others.

¶39  Promer asserts that "[t]he public need was minimal" because there is no evidence that the parking lot was full, that his driving interrupted traffic, or that the stop was necessary to preserve evidence.  He also notes that when the deputies activated their vehicles' emergency lights, he "drove slowly and parked in a parking stall."  He therefore contends that the situation presented no exigencies because there was no risk to either the public or to Promer himself if the officers failed to act quickly.

¶40    We reject this argument because at the time the deputies stopped Promer's vehicle, they had no way of knowing that he was about to park his car. Given that Promer had previously been sleeping or passed out in his vehicle in the parking lot, had subsequently left the parking lot and driven on the road, and had then returned to the parking lot, the officers could reasonably believe that if they did not stop Promer's vehicle, there was a risk that he would proceed back onto the road, where he would pose a danger to himself and to the public.

¶41    Turning to the second factor, the attendant circumstances surrounding the seizure show that it was not particularly intrusive. The stop occurred shortly after 9:30 p.m. in a public place. Although there were two deputies present, and both of them activated their squad cars' emergency lights, there is no evidence in the appellate record to suggest that they made any other overt display of authority or force. Instead, the record merely indicates that the deputies stood near the driver's side door of Promer's vehicle and asked him questions.

¶42    Promer contends that a reasonable person, "who by his own admission was tired enough to pull off the road to rest and who suffered from low blood sugar, would be alarmed by the squad cars and officers." We agree with the State, however, that a reasonable person in Promer's position—that is, a person who had passed out or fallen asleep in his vehicle, had woken up, had driven a short distance, and had then returned to the same parking lot intending to park his car because his tiredness and blood sugar level made him unable to drive safely— likely would not have been alarmed by the deputies' conduct. Instead, as the State aptly notes, a reasonable person in that position "would understand why officers might be concerned for his safety and the safety of the public."

16

¶43 As for the third factor, the fact that the seizure involved an automobile further supports a conclusion that the public interest outweighed the intrusion on Promer's privacy. As discussed above, although the Supreme Court recently held in *Caniglia* that the community caretaker doctrine cannot be used as a standalone justification for warrantless searches and seizures in the home, the Court emphasized that "[w]hat is reasonable for vehicles is different from what is reasonable for homes." *Caniglia*, 141 S. Ct. at 1598, 1600.

¶44 Under the fourth factor, we must consider the availability, feasibility, and effectiveness of alternatives to the type of intrusion actually accomplished. *See Kramer*, 315 Wis. 2d 414, ¶41. We agree with the State that under the circumstances presented here, the deputies had no reasonable alternative but to stop Promer's vehicle to determine whether he needed assistance. It would not have been reasonable for the deputies to simply do nothing and hope that Promer could drive safely, even though they knew that he had been passed out or asleep in his vehicle in a parking lot about ten minutes earlier, and that he had subsequently left the parking lot but had returned to it a short time later. If Promer was experiencing a medical emergency, or was too tired to drive safely, and the deputies had declined to stop his vehicle when they arrived at the bar, "it may have been too late for effective assistance at some later time." *See id.*, ¶45.

¶45 Promer argues that instead of having both deputies approach his vehicle, "[o]ne deputy could have remained in his squad car while the other spoke to … Promer." However, Promer does not explain why it would have made any difference if only one deputy had approached his vehicle during the stop. It does not appear that the stop would have been significantly less intrusive if only one of the deputies had approached Promer's vehicle, while the other remained in his squad car a short distance away.

¶46    Accordingly, all four factors under the third step of the community caretaker analysis support a conclusion that the deputies' exercise of a bona fide community caretaker function was reasonable under the circumstances.  *See id.*, ¶40.  In other words, the public need and interest supporting the stop of Promer's vehicle outweighed the intrusion upon his privacy.  *See id.*, ¶21.

**CONCLUSION**

¶47    For the reasons explained above, we conclude that the State has satisfied each of the three steps of the community caretaker analysis.  Like the circuit court, we therefore conclude that the deputies' stop of Promer's vehicle was permissible under the community caretaker doctrine.  We reject Promer's argument that *Caniglia* eliminated the community caretaker doctrine as a standalone justification for all warrantless searches and seizures.  Instead, *Caniglia* merely clarified that the community caretaker doctrine cannot be used to justify warrantless intrusions into the home.  As such, the court properly denied Promer's suppression motion.[1]

---

[1] The State asserts that after the deputies stopped Promer's vehicle and made contact with him, their observations of Promer gave rise to reasonable suspicion that he had operated his vehicle while intoxicated, which allowed the deputies to investigate further, including by asking Promer to perform field sobriety tests.  The State also contends that after Promer refused to perform field sobriety tests, the deputies had probable cause to arrest him and to search his person and vehicle.

Promer does not dispute that if the initial stop of his vehicle was valid, then the deputies' observations during the stop gave rise to reasonable suspicion allowing them to investigate further and to request field sobriety tests.  Promer also fails to dispute the State's assertion that his arrest and the subsequent searches were supported by probable cause.  We therefore deem these points conceded, and we do not address them further.  *See Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979) (unrefuted arguments may be deemed conceded).

18

*By the Court.*—Judgment affirmed.

Not recommended for publication in the official reports.