COURT OF APPEALS
DECISION
DATED AND FILED

September 24, 2019

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2018AP1762-CR**

Cir. Ct. No. **2018CF32**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

JESSE J. JENNERJOHN,

DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Outagamie County: MITCHELL J. METROPULOS, Judge. *Reversed and cause remanded with directions*.

Before Stark, P.J., Hruz and Seidl, JJ.

¶1 STARK, P.J. Jesse Jennerjohn appeals a judgment convicting him of possession with intent to deliver tetrahydrocannabinols (THC). He contends the circuit court erred by denying his motion to suppress evidence that police found

during a warrantless search of his residence. The State argues the search was permissible under the community caretaker exception to the warrant requirement. We conclude, however, that the officers were not exercising a bona fide community caretaker function when they searched Jennerjohn's residence, and, even if they were, the public interest in searching the residence did not outweigh the intrusion upon Jennerjohn's privacy. As such, the community caretaker exception is inapplicable, and the warrantless search of Jennerjohn's residence was unconstitutional.

¶2    The State argues, in the alternative, that even if the search was unconstitutional, "exclusion is not an appropriate remedy under the circumstances." We disagree, for the reasons explained below. Accordingly, we reverse Jennerjohn's judgment of conviction and remand with directions that the circuit court grant Jennerjohn's suppression motion.

## BACKGROUND

¶3    The following facts are taken from the testimony and other evidence introduced during the suppression hearing. On November 29, 2017, sometime after 11 p.m., City of Appleton police officer Dominic Hall was dispatched to Grumpy's Pub regarding a report of a man using profanity toward the bar's employees, trying to start a fight with other patrons, and throwing things. When Hall arrived at the bar, he spoke with two female bartenders who told him that they had kicked the individual in question out of the bar twice, and the second time he stated he had "warned them" and they "better run." The individual then drove away from the bar. One of the bartenders had written down his vehicle's license plate number, and police learned that the vehicle was registered to Jennerjohn.

¶4 Appleton police officer Nicholas Meyer was dispatched to Jennerjohn's residence following the disturbance at Grumpy's Pub. When Meyer arrived at the residence, he saw Jennerjohn's vehicle parked in the driveway. Meyer parked about one block away from the residence and saw a man—whom he believed to be Jennerjohn—exiting the home. Hall arrived shortly thereafter, along with officer Alyssa Blankenship, lieutenant Carlos del Plaine, and another officer who did not testify at the suppression hearing. Hall testified the officers' purpose in going to Jennerjohn's home was "to talk to [Jennerjohn] to make sure that he knew that he was no longer welcome at Grumpy's Pub" and "also to ascertain in what context he was making threats, and to hopefully deter future similar actions against the patrons of the bar or anyone inside of the bar." When asked whether the officers planned to arrest Jennerjohn based on the information available to them at that time, Hall responded, "I needed to gather further information."

¶5 After the officers arrived at Jennerjohn's residence, they formulated a plan of approach and began walking toward the home. While they were doing so, they saw a man—who was later identified as Jennerjohn—and a woman—who was later identified as Jennerjohn's neighbor, Lisa Walker—standing outside of the house next door to Jennerjohn's home. When Jennerjohn saw the officers approaching, he began moving quickly toward his residence. Hall ran after Jennerjohn and yelled for him to stop, but Jennerjohn ran inside his house. The officers then positioned themselves around the house, with Meyer positioned behind Jennerjohn's vehicle. From that vantage point, Meyer could see a rifle case in the backseat of the vehicle, but he could not tell whether there was a rifle inside it.

¶6 Hall testified he knocked on Jennerjohn's door for several minutes and repeatedly announced "that we were the Appleton Police Department and that we wanted to speak with [Jennerjohn]." According to Hall, Jennerjohn did not respond verbally, but he came out "from his back room, [and] made movement up to the window and back several different times." On one occasion when he came to the window, Jennerjohn had a phone in his hand and appeared to be recording the officers.

¶7 Meyer similarly testified that from his position behind Jennerjohn's vehicle, he could see Jennerjohn moving around inside his residence, walking in and out of what appeared to be a bedroom, and using a cell phone to record the officers through the window. Meyer did not see anyone besides Jennerjohn inside the house, nor did anyone tell him that there was another person inside. Meyer testified there was sufficient light for him to see Jennerjohn inside the house, and if there had been another person in the areas of the house where he could see Jennerjohn, Meyer would have seen that person too.

¶8 While Hall was attempting to make contact with Jennerjohn, Blankenship spoke with Walker, Jennerjohn's neighbor. During that conversation, Walker told Blankenship that Jennerjohn lived alone. However, Blankenship could not recall whether she relayed that information to any of the other officers on the scene. Walker subsequently told Hall that Jennerjohn had come to her home that evening seeking help because he had cut one of his hands. Walker stated Jennerjohn's hand was bleeding quite a bit, he was intoxicated, and she was concerned he was suffering from some kind of mental illness. According to Walker, Jennerjohn stated that he wanted to get his gun and go back to the bar and "shoot that dude." Walker testified that she told the officers Jennerjohn lived

alone, and she never told them that Jennerjohn lived with anyone else or that there was anyone else inside his home that night.

¶9    Officer Craig Rohm, who had arrived at the scene after the other officers, called Dawn De Guelle, who he knew was a friend of Jennerjohn's. De Guelle and Jennerjohn's brother Larry then drove to Jennerjohn's home to assist the officers. On the way there, both Larry and De Guelle spoke to Jennerjohn by phone. Jennerjohn told De Guelle that his foot hurt and he needed medical attention. He also told De Guelle that he was alone, he wanted to go to sleep, and he wanted the police to stop bothering him.

¶10   De Guelle testified that after speaking to Jennerjohn, she called Rohm back and told him that Jennerjohn was alone. De Guelle explained that she specifically told Rohm that Jennerjohn was alone because a few months earlier she had enlisted Rohm's help in getting some unwanted guests to leave Jennerjohn's residence, and she wanted to make it clear to Rohm that those people "were no longer living there." Rohm testified that De Guelle "could have" informed him Jennerjohn was alone in the house, but he could not remember whether she did so.

¶11   Jennerjohn came out of his house voluntarily between thirty and sixty minutes after the officers arrived. He was holding something in his hand, which the officers later identified as venison. Jennerjohn began walking toward the officers, while making "loud, aggressive, grunting, guttural noises." He ignored the officers' commands to stop and yelled something akin to "Just shoot me." At that point—when Jennerjohn was over ten meters away from the front door of his home—the officers tased Jennerjohn and placed him in handcuffs.

¶12   Shortly after he was taken into custody, Jennerjohn told the officers that there were no people or animals inside his home. Hall conceded during the

suppression hearing that, up until that point, he had not observed anything suggesting there was anyone other than Jennerjohn inside the residence. Larry also testified that after he and De Guelle arrived at the scene, he told the officers there was no one else inside Jennerjohn's house.

¶13    After Jennerjohn told the officers there was no one else inside his home, Meyer walked up to Jennerjohn's residence, opened the front door, and called out, "Appleton Police Department. If there's anybody inside, announce yourself now." There was no response from inside the house. Meyer then instructed another officer to ask del Plaine "if he wants us to do a protective sweep [to] make sure there's no one left inside." While waiting for instructions from del Plaine, Meyer continued standing by the door and called out three more times, "Appleton Police Department. If there's anybody inside, announce yourself now."

¶14    Shortly thereafter, del Plaine decided the officers should enter Jennerjohn's home in order to conduct a "protective sweep" of the premises. Meyer was the first officer to enter the house. Once inside, the officers did not announce their presence or call out to see whether anyone was in need of assistance. Less than one minute after he went inside, Meyer opened a closet door and discovered twelve large mason jars containing marijuana. The officers also found guns in Jennerjohn's home, which they gave to Larry and De Guelle for safekeeping.

¶15    Jennerjohn was transported to a local hospital, and while there Hall cited him for disorderly conduct and gave him a warning for obstruction. An Outagamie County crisis worker then spoke with Jennerjohn and approved a seventy-two-hour emergency detention.

¶16    The State ultimately charged Jennerjohn with one count of possession with intent to deliver THC. Jennerjohn moved to suppress the marijuana found in his residence, arguing the warrantless search of his home violated his constitutional rights. The State opposed Jennerjohn's motion, arguing the warrantless search was justified pursuant to either the protective sweep or community caretaker exception to the warrant requirement.

¶17    The circuit court held a two-day suppression hearing. During the hearing, Meyer testified that his intention in conducting the sweep was "[t]o verify that there weren't any other victims that may be inside or potential other suspects or threats." In addition, he stated that after opening the door of Jennerjohn's residence, he observed "a few pictures of young children," which made him think "that there could possibly be children that also resided at the residence that could have been victims of [Jennerjohn's] erratic behavior." Meyer testified he was not investigating a crime or looking for drugs while conducting the sweep.

¶18    Del Plaine testified that he ordered a protective sweep of Jennerjohn's residence

> because Mr. Jennerjohn's behavior was so over the top, from just being potentially intoxicated, being upset, and not wanting to come out of the house or make contact with us to talk to us, to escalating to such a point that he was yelling for us to shoot him, he was advancing on officers, he was not listening to commands to the point of what happened … just making the protective sweep of the house, just to make sure there was … not somebody else in there, that his … behavior wasn't … caused by, you know— Maybe there was somebody else in there? Maybe … [were] there firearms in there that would need to be secured? Would the … ultimately his brother and [De Guelle], you know, were not … were not in any way be[ing] detained, would they be walking into some situation that would be unsafe for them? —Because once we left … they would certainly be free to go in the house or, you know, secure the residence. So that was my

7

decision that because there was this extreme escalation in his behavior, that [the protective sweep] was just a prudent thing to do.

¶19 Hall similarly testified that the officers conducted the protective sweep because they were concerned there might have been someone inside Jennerjohn's house who either needed help or could have posed a threat to the officers' safety. He testified that he was not aware of any discussion about getting a warrant before the officers entered Jennerjohn's residence.

¶20 The circuit court denied Jennerjohn's suppression motion, concluding the warrantless search of his residence was permissible under the community caretaker exception to the warrant requirement. The court concluded that the officers were performing a bona fide community caretaker function when they searched Jennerjohn's residence, based on the following factors: (1) the officers were concerned there might be other individuals, including children, inside the home; (2) there was also "a concern of firearms" in the home; (3) Jennerjohn had threatened individuals at the bar and had made a statement about going back to the bar to shoot someone; (4) Jennerjohn appeared to be intoxicated and possibly suffering from a mental illness; (5) Jennerjohn had something in his hand when he exited his residence; (6) the officers were concerned that Larry and De Guelle might "enter into the residence and then be subject to perhaps someone else that was inside the residence"; (7) Jennerjohn's behavior was "unusual, … concerning, and perhaps … suicidal"; (8) the officers had no confirmation that there was no one else inside Jennerjohn's residence; and (9) the unexplained injury to Jennerjohn's hand created a "legitimate concern" that "there had been a disturbance within the residence" involving another individual. The court further concluded that the public interest in searching Jennerjohn's residence outweighed the intrusion upon his privacy.

¶21    Jennerjohn subsequently pled no contest to the possession with intent to deliver THC charge. He now appeals, arguing the circuit court erred by denying his suppression motion.

## DISCUSSION

¶22    When reviewing a circuit court's decision on a motion to suppress evidence, we will uphold the court's findings of historical fact unless they are clearly erroneous. *State v. Pinkard*, 2010 WI 81, ¶12, 327 Wis. 2d 346, 785 N.W.2d 592. However, we independently review the court's application of constitutional principles to those facts. *Id.*

¶23    Both article I, section 11 of the Wisconsin Constitution and the Fourth Amendment to the United States Constitution guarantee the right to be free from unreasonable searches. *State v. Faust*, 2004 WI 99, ¶10, 274 Wis. 2d 183, 682 N.W.2d 371. "Subject to a few well-delineated exceptions, warrantless searches are deemed per se unreasonable." *Id.*, ¶11. In this case, the State asserts—and the circuit court agreed—that the officers' warrantless search of Jennerjohn's residence[1] fell within the community caretaker exception to the

---

[1] The parties correctly note that this case technically involves two searches, rather than one. The first search occurred when Meyer opened the door to Jennerjohn's home, and the second occurred when the officers entered the home to conduct what they referred to as a "protective sweep."

The parties seem to agree that only the second search matters, for purposes of this appeal, because the police did not discover anything as a result of the first search. We are not convinced, however, that the parties are correct on this point. Notably, Meyer did not see the photographs of children inside Jennerjohn's home until after he opened the home's front door. The fact that there were photographs of children in the home was later cited by Meyer—and relied upon by the circuit court—as a justification for the officers' belief that it was necessary to search the residence to determine whether there was anyone inside. Thus, a fact that the officers discovered during the first search was ultimately used to justify the second search. Nonetheless, we follow the parties' lead and analyze only the second search.

warrant requirement.[2]   In the alternative, the State argues that even if the community caretaker exception does not apply and the search of Jennerjohn's residence was therefore unconstitutional, exclusion of the marijuana found during the search is not the appropriate remedy under the circumstances.  We address these arguments in turn.

## I.  The community caretaker exception

¶24     The community caretaker exception recognizes that "a police officer serving as a community caretaker to protect persons and property may be constitutionally permitted to perform warrantless searches and seizures." *Pinkard*, 327 Wis. 2d 346, ¶14.   We apply a three-step test to determine whether the community caretaker exception applies in a given case.  *Id.*, ¶29.   First, we determine whether a search or seizure within the meaning of the Fourth Amendment has occurred.  *Id.*   If a Fourth Amendment search or seizure has occurred, we then consider whether the police were exercising a bona fide community caretaker function at the time of the search or seizure.  *Id.*   If so, we lastly determine whether the public interest in the search or seizure outweighs the intrusion upon the individual's privacy, such that the officers reasonably exercised their community caretaker function.  *Id.*   The State bears the burden of proving that the community caretaker exception applies in a given case.  *Id.*

---

[2] The State has wisely abandoned the alternative argument it raised in the circuit court that the search fell within the protective sweep exception to the warrant requirement.  Under the protective sweep exception, incident to an arrest, officers may search "spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Maryland v. Buie*, 494 U.S. 325, 334 (1990).  Here, Jennerjohn was detained outside his home, over ten meters away from the home's front door.  Accordingly, Jennerjohn's home was not a space "immediately adjoining the place of arrest," *see id.*, and the protective sweep exception is inapplicable.

¶25     Here, it is undisputed that a search within the meaning of the Fourth Amendment occurred when the police entered and searched Jennerjohn's home. We therefore proceed to the second step of the analysis and address whether the officers were exercising a bona fide community caretaker function when they performed the search. *See id.*

### A.  Bona fide community caretaker function

¶26     In order to determine whether the officers in this case were exercising a bona fide community caretaker function when they searched Jennerjohn's residence, we must "examine the totality of the circumstances as they existed at the time of the police conduct." *See State v. Kramer*, 2009 WI 14, ¶30, 315 Wis. 2d 414, 759 N.W.2d 598.   "[W]hen under the totality of the circumstances an objectively reasonable basis for the community caretaker function is shown, that determination is not negated by the officer's subjective law enforcement concerns." *Id.*

¶27     On appeal, the State contends the officers in this case were performing a bona fide community caretaker function when they searched Jennerjohn's home for two reasons: (1) the facts gave rise to an objectively reasonable belief that the home contained firearms, and given Jennerjohn's erratic behavior, it was necessary for the officers to secure those firearms; and (2) the officers "did not know" if there was anyone else in the home who might be in need of assistance, and under the circumstances, they "could not rule out that possibility."   Neither of these justifications convinces us that the officers were performing a bona fide community caretaker function when they searched Jennerjohn's residence.

¶28    As to the State's first proffered justification for the search, while it may have been objectively reasonable for the officers to conclude that Jennerjohn's home might contain firearms—based on the rifle case in Jennerjohn's vehicle and Jennerjohn's statement that he wanted to get his gun and "shoot that dude" at the bar—there was no objectively reasonable basis for the officers to conclude that they needed to enter the home without a warrant immediately after Jennerjohn was detained in order to seize those firearms.  Jennerjohn was taken into custody outside his residence, and there was no reason for the officers to believe that his release from custody was imminent.  In fact, an ambulance transported Jennerjohn to a local hospital following the search.  While the officers could not know at the time of the search that Jennerjohn would subsequently be placed under a seventy-two-hour emergency detention, there was no immediate need for the officers to enter Jennerjohn's home to locate and secure any firearms that may have been inside.[3]

¶29    The State's second justification for the search fails because the circumstances did not support an objectively reasonable belief that there was anyone inside Jennerjohn's home who might be in need of assistance.  Walker told Blankenship that Jennerjohn lived alone.  Before he was apprehended, Jennerjohn told De Guelle that he was alone in the house, and De Guelle testified that she relayed that information to Rohm.  Larry similarly testified that he told the officers there was no one else inside Jennerjohn's home.  The officers did not see anyone inside the home.  After Jennerjohn was detained, he told the officers there were no people or animals inside.  When Meyer went to the door of the residence and

---

[3] Moreover, as we discuss below, the officers had alternative means of securing any firearms, besides performing a warrantless search of Jennerjohn's residence. *See infra*, ¶47.

repeatedly called out, "Appleton Police Department. If there's anybody inside, announce yourself now," there was no response. On these facts, the officers could not reasonably conclude that it was necessary to search Jennerjohn's residence for an individual who might be in need of assistance.

¶30    In its appellate brief, the State cites only one fact in support of its claim that it was objectively reasonable for the officers to believe another person might have been inside Jennerjohn's residence: the "unexplained injury" to Jennerjohn's hand, which the State asserts "could have been caused by an altercation in the home." Although the cause of Jennerjohn's injury was not immediately apparent at the time he was detained, there was no evidence specifically indicating that Jennerjohn had sustained that injury inside his home as the result of an altercation with another person. Given the lack of any evidence of an altercation, as well as the evidence summarized above indicating that Jennerjohn was alone in his residence, we conclude it was not objectively reasonable for the officers to believe there was another person inside who might be in need of assistance.[4]

---

[4] In the circuit court, the State also relied on Meyer's testimony that he saw photographs of children in Jennerjohn's home, which "caused concern that there could possibly be children that also resided at the residence that could have been victims of [Jennerjohn's] erratic behavior." In its oral ruling denying Jennerjohn's suppression motion, the court similarly cited the officers' "concern" that there may have been "small children in the home" as evidence that the officers were exercising a bona fide community caretaker function.

On appeal, the State does not renew its argument that the photographs of children in Jennerjohn's home supported an objectively reasonable belief that there were individuals inside who might be in need of assistance—perhaps because, as we note above, the photographs were observed during the first warrantless search of Jennerjohn's home. Regardless, we conclude that given all of the other evidence indicating there was no one other than Jennerjohn in the residence, the photographs did not provide an objectively reasonable basis for the officers to conclude there might be someone else inside.

¶31 In reaching our conclusion that it was not objectively reasonable for the officers to believe another person was inside Jennerjohn's residence, we find instructive both *State v. Maddix*, 2013 WI App 64, 348 Wis. 2d 179, 831 N.W.2d 778, and *State v. Matalonis*, 2016 WI 7, 366 Wis. 2d 443, 875 N.W.2d 567. In *Maddix*, two officers responded to a call reporting a domestic disturbance in the upper unit of a two-flat house. *Maddix*, 348 Wis. 2d 179, ¶2. While outside the house, the officers heard a female yelling in the upper portion of the building. *Id.* The officers knocked on the door of the house but received no response. *Id.*, ¶3. After hearing additional female screams, the officers forced entry and proceeded up a set of stairs toward the house's upper unit. *Id.*, ¶¶3-4.

¶32 The officers then knocked on a second-floor interior door, which Maddix opened. *Id.*, ¶4. After entering the apartment, the officers saw only two people inside—Maddix and an adult female. *Id.* The officers conducted separate interviews of Maddix and the female in different areas of the apartment. *Id.* Maddix told one officer that the female was his girlfriend, that the two of them were the only people in the apartment, and that they had been arguing because his girlfriend thought he was cheating on her. *Id.*, ¶5. Maddix's girlfriend told the other officer that she and Maddix had been having an argument and that she was screaming "because she was scared[,] but she didn't know what she was scared of." *Id.*, ¶6. The officers ultimately decided to perform a "protective sweep" of Maddix's apartment. *Id.*, ¶7. At the suppression hearing, one of the officers testified they did so because the girlfriend's explanation of the screaming did not make sense, and they were concerned there could be another victim or aggressor in the apartment. *Id.*

¶33 On appeal, we concluded the officers were not performing a bona fide community caretaker function when they searched Maddix's apartment

14

because they did not have "an objectively reasonable basis to believe that a member of the public was in need of assistance or that the officers' or others' safety was at risk at the time of the search." *Id.*, ¶20. We reasoned there was "no evidence" that "directly corroborated the officers' theory that another person was present in the apartment, who was either a crime victim or a perpetrator." *Id.*, ¶27. We explained:

> Maddix told [one of the officers] during the individual interview that he and the female were the only ones in the apartment. Maddix explained that the two were in an argument because the female suspected that Maddix was "cheating on her." Similarly, during her individual interview, the female told [the other officer] that the two were having an argument. The female also told the officer that she was the source of the screams. While it was certainly a physical possibility that one or more persons were in the apartment, there were no objectively reasonable grounds to suspect that the disturbance involved persons other than Maddix and his girlfriend, who each independently told the officers that they had been arguing about their own relationship.

*Id.*

¶34 Similarly, there was "no evidence" in this case that "directly corroborated" a belief that there was someone else inside Jennerjohn's residence. *See id.* As in *Maddix*, while there was certainly a "physical possibility" that another individual was inside the house, there were no "objectively reasonable" grounds for the officers to suspect that was actually the case. *See id.*

¶35 In *Matalonis*, officers were dispatched to an apartment for a medical call. *Matalonis*, 366 Wis. 2d 443, ¶4. When they arrived, they observed blood "all over the door." *Id.* The defendant's brother, Antony Matalonis, answered the door covered in blood and "highly intoxicated." *Id.* Antony initially told the officers that he had been beaten up by four different groups of people outside a

15

bar, but he later said he had been beaten up by four people outside a bar. *Id.* The tenant of the apartment told the officers that Antony lived down the street with his brother and was already injured when he arrived at the apartment. *Id.*, ¶¶4, 6.

¶36     After Antony was transported to the hospital, the officers examined the area around the apartment to determine where the blood outside the apartment had originated. *Id.*, ¶6. They found a single trail of blood in the snow, which led to the side door of a nearby residence. *Id.*, ¶¶6-7. The officers observed blood on both the screen door and the wooden exterior door of that residence, and they heard two loud bangs coming from inside. *Id.* When the officers knocked on the front door, the defendant—Matalonis—answered. *Id.*, ¶9. The officers could see blood on the floor of the foyer and leading up to a stairwell. *Id.* Matalonis told the officers that he lived alone and had been in a fight with his brother, Antony, who had since left. *Id.*, ¶10. The officers then entered the residence and conducted a search. *Id.*, ¶11. They followed a trail of blood upstairs and found a locked door with blood spatters on it. *Id.*, ¶¶12-13. The officers ultimately obtained the key, opened the locked door, and found a large marijuana plant inside. *Id.*, ¶¶18-19.

¶37     Matalonis moved to suppress the evidence discovered during the warrantless search of his residence. *Id.*, ¶21. Our supreme court ultimately determined the search was permissible under the community caretaker exception to the warrant requirement. *Id.*, ¶3. In addressing whether the officers were performing a bona fide community caretaker function, the court explained:

> The blood in this case—on the stairwell of the first apartment, in the snow, on the side doors of Matalonis's house, on the floor of the foyer of Matalonis's house, and leading up to the stairwell in Matalonis's house—came from somewhere, obviously, and Antony indicated that multiple individuals were involved in the fight that led to

> his injuries. Antony initially told [an officer] that he had been beaten up by four different groups of people outside of a bar, but later said that he was beaten up by four people outside of a bar. Matalonis, in contrast, told the officers that he and Antony alone had fought. Additionally, the resident at the address to which the officers had first responded told the officers that Antony lived with his brother, but Matalonis told the officers that he lived alone. [The officers] were apparently concerned that perhaps Matalonis was not telling the truth. They had also heard loud noises coming from inside Matalonis's residence.

*Id.*, ¶49. The court concluded these facts created "an objectively reasonable basis for the police to believe an injured individual needed their help." *Id.* (emphasis omitted).

¶38 In this case, there was no evidence such as a blood trail leading into Jennerjohn's residence that would have caused the police to believe someone in the residence might need assistance. The officers here did not receive conflicting information about how many people lived in Jennerjohn's residence. While the officers did receive information that Jennerjohn had injured his hand, they did not receive information suggesting that he had been in an altercation with anyone in his residence. In addition, the officers did not hear any noises coming from inside the residence that indicated anyone other than Jennerjohn was inside, including after the officers repeatedly announced themselves and instructed anyone inside to announce him- or herself. The factors that supported the officers' objectively reasonable belief that there was an individual in need of assistance in *Matalonis* are therefore absent here.

¶39 During its oral ruling, the circuit court cited several additional factors—beyond those raised by the State on appeal—in support of its conclusion that the officers in this case were performing a bona fide community caretaker function. *See supra*, ¶¶20, 27. For instance, the court noted that Jennerjohn's

behavior was "unusual, … concerning, and perhaps … suicidal," that he appeared to be intoxicated and/or suffering from a mental illness, and that he had threatened to return to the bar and shoot someone. At the time of the search, however, Jennerjohn had already been taken into custody. Accordingly, his erratic behavior did not pose an immediate danger to the officers or anyone else at the time the search was performed.

¶40 The circuit court also observed that Jennerjohn had something in his hand when he exited his residence. Before they performed the search, however, the officers determined that the item in question was a piece of venison. The court did not explain why the fact that Jennerjohn was holding a piece of venison when he came out of his residence supported an objectively reasonable basis for the officers to believe it was necessary to search his residence in order to protect themselves or others.

¶41 Finally, the circuit court stated there could have been someone else inside Jennerjohn's residence who "could have been another danger to the officers and to other members of the public." That justification for the search is unpersuasive because, as explained above, the facts known to the officers at the time of the search did not support an objectively reasonable belief that there was anyone inside Jennerjohn's home.

¶42 For all of the foregoing reasons, we conclude the officers in this case were not performing a bona fide community caretaker function when they searched Jennerjohn's residence. As such, the community caretaker exception to the warrant requirement is inapplicable here.

## B. *Reasonable exercise of a community caretaker function*

¶43    Moreover, even if we agreed that the officers in this case were performing a bona fide community caretaker function when they searched Jennerjohn's residence, we would nevertheless conclude that the community caretaker exception was inapplicable based on the third prong of the analysis. Under that prong, we must consider whether the public interest in the search outweighed the intrusion upon Jennerjohn's privacy, such that the officers reasonably exercised their community caretaker function. *See **Pinkard***, 327 Wis. 2d 346, ¶29. We consider four factors when balancing these competing interests: (1) the degree of the public interest and the exigency of the situation; (2) the circumstances surrounding the search, including the time, the location, and the degree of overt authority or force displayed; (3) whether an automobile was involved; and (4) the availability, feasibility, and effectiveness of alternatives to the search. ***Id.***, ¶42. In this case, the first, third, and fourth factors weigh against the application of the community caretaker exception.

¶44    As for the first factor, the public interest in searching Jennerjohn's residence and the degree of exigency were both relatively low. As explained above, there was no evidence directly indicating that anyone was inside the residence after Jennerjohn was taken into custody. While there was some evidence suggesting there could be firearms inside the home, Jennerjohn had been detained and placed in handcuffs prior to the search. There is no indication in the record that the officers planned to release Jennerjohn from custody once the search was completed, and, as noted above, an ambulance subsequently transported Jennerjohn to a hospital. Under these circumstances, there was no immediate need for the officers to conduct a warrantless search of Jennerjohn's residence either to locate any individuals or to secure any firearms that may have been inside.

¶45     Turning to the third factor, this case involved a search of Jennerjohn's residence, rather than an automobile.  A warrantless entry into a home is "more suspect" than the search of a motor vehicle and is therefore "subjected to stricter scrutiny."  **State v. Ultsch**, 2011 WI App 17, ¶¶12, 18, 331 Wis. 2d 242, 793 N.W.2d 505.

¶46     Regarding the fourth factor, the State argues the officers in this case "had no feasible alternative to entering and sweeping Jennerjohn's home" because they "could not get a warrant," given that there was "no fact that would establish that Jennerjohn's home probably contained evidence of a crime."  The State contends that under these circumstances, the officers' only options were "to sweep the home or to leave the home unsecured."

¶47     We are not persuaded.  First, as already discussed, there was no objectively reasonable basis for the officers to believe that there was a person inside Jennerjohn's home who might be in need of assistance.  Second, to the extent the officers believed it was necessary to enter the home in order to secure any weapons that might be inside, the officers had other options, besides conducting a warrantless search.  For instance, they could have simply asked De Guelle or Larry to enter the residence and remove any firearms.[5]  In fact, the firearms were turned over to De Guelle and Larry for safekeeping after they were removed from the home.

---

[5] The State argues it would have been "objectively unreasonable for the officers to have [De Guelle or Larry] enter the home to secure the firearms not knowing if anyone else was inside of the home."  Once again, however, there was no objectively reasonable basis to believe that anyone was inside the home after Jennerjohn was detained.

¶48 We agree with the State that the second of the four factors—i.e., the circumstances surrounding the search, including the time, the location, and the degree of overt authority or force displayed—supports the State's position. The officers in this case were responding to a citizen complaint and therefore "did not control the time of day or location." *See **Pinkard***, 327 Wis. 2d 346, ¶49. Although the officers displayed a significant degree of authority when they tased Jennerjohn and placed him in handcuffs, we cannot say that those actions were unjustified, given Jennerjohn's erratic behavior. Nonetheless, the second factor, standing alone, is insufficient to outweigh the first, third, and fourth factors, which together demonstrate that the public interest in searching Jennerjohn's residence did not outweigh the intrusion upon his privacy. As such, even if the officers were performing a bona fide community caretaker function when they searched Jennerjohn's residence, we conclude the community caretaker exception is inapplicable here.

## II. The appropriate remedy for the Fourth Amendment violation

¶49 The State argues that even if the warrantless search in this case violated the Fourth Amendment, exclusion of the evidence discovered in Jennerjohn's home is not the appropriate remedy for the violation. The exclusionary rule provides for the suppression of evidence that is the product of illegal governmental activity. ***State v. Felix***, 2012 WI 36, ¶30, 339 Wis. 2d 670, 811 N.W.2d 775. The rule's primary purpose is to deter future unlawful police conduct. ***Id.*** Notably, however, the exclusionary rule "is a judicially created remedy, not a right, and its application is restricted to cases where its remedial objectives will best be served." ***State v. Dearborn***, 2010 WI 84, ¶35, 327 Wis. 2d 252, 786 N.W.2d 97. Thus, the mere fact that a Fourth Amendment violation has occurred is insufficient to justify application of the exclusionary rule. ***Id.*** Instead,

when deciding whether to apply the rule, we must consider whether its application will be effective in deterring future violations. *Id.*

¶50 The State argues that applying the exclusionary rule in this case would have a significant social cost because it would deter officers from performing their community caretaker function when they encounter mentally unstable individuals who could pose a danger to themselves or others. However, the officers in this case performed their community caretaker function—they took Jennerjohn into custody and transported him to a hospital for an evaluation, thus neutralizing his immediate access to firearms and any threat he may have posed to the officers, to himself, or to anyone else. Under the circumstances, the officers did not need to enter and search Jennerjohn's home in order to act as community caretakers.

¶51 In the absence of a bona fide community caretaker function, the officers in this case could not enter and search Jennerjohn's home without a warrant, discover incriminating evidence, and subsequently use that evidence in a prosecution against Jennerjohn. Such a warrantless search is per se unreasonable. *See Faust*, 274 Wis. 2d 183, ¶11. Applying the exclusionary rule in this case will serve to deter future violations under similar circumstances. As such, we reject the State's argument that even if the officers in this case violated the Fourth Amendment, the evidence discovered during their unconstitutional warrantless search of Jennerjohn's residence should not be suppressed. We therefore reverse Jennerjohn's judgment of conviction and remand with directions that the circuit court grant his suppression motion.

*By the Court.*—Judgment reversed and cause remanded with directions.

Not recommended for publication in the official reports.